# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| ADMIRAL PERRY,<br>　　Petitioner, | : : : | CIVIL ACTION<br><br>No. 2:09-cv-02795 |
| v. | : : | |
| DAVID VARANO, et. al.,<br>　　Respondents. | : : : | |

**Memorandum**

YOHN, J.                                                                                          July 19, 2010

Petitioner, Admiral Perry, is serving a life term for first-degree murder followed by thirty to sixty years for kidnaping, involuntary deviate sexual intercourse, and rape.[1]  He seeks habeas corpus relief pursuant to 28 U.S.C. § 2254 based on alleged constitutional violations that resulted in his conviction.  Pursuant to 28 U.S.C. § 636(b)(1)(B), the court referred his petition to United States Magistrate Judge Carol Sandra Moore Wells for a Report and Recommendation.  The Magistrate Judge recommended that all of Perry's habeas claims be dismissed or denied without an evidentiary hearing.  Perry has filed objections to portions of the Report and Recommendation, chiefly with regard to his claims concerning the admissibility of evidence obtained through a search warrant and affidavit of probable cause.  After conducting a *de novo* review of the Report and Recommendation, the court will overrule Perry's objections, adopt the report in substantial part, and approve the recommendation.  Perry's claims are either factually wrong, procedurally defaulted, or lacking in merit based on long-standing Supreme Court precedent.

---

[1]  The sentence is also consecutive to a sentence of fifteen to thirty years that Perry was already serving for a 1982 third-degree murder, robbery, and burglary conviction, as well as an additional, consecutive sentence of five to ten years related to a 1975 rape and robbery conviction.  <u>Commonwealth v. Perry</u>, 959 A.2d 932, 934 n.2 (Pa. Super. Ct. 2008).

# I.     Factual and Procedural Background

The Pennsylvania Superior Court summarized the facts of the crime for which Perry was

convicted as follows:

> [On June 26, 1980], between 10:30 p.m. and 11:00 p.m., Mary Totor dropped off
> Kay Aisenstein (the victim) at her home located at 7661 Overbrook Avenue in the
> City of Philadelphia.  Ms. Aisenstein then proceeded to take her nightly walk with
> her dog.  She did not return home.
>
> At approximately 10:50 p.m., Joseph Frio was standing near 77th and Overbrook
> Avenue in the City of Philadelphia when he heard someone screaming from the
> driveway behind the 7700 block of Overbrook Avenue.  When he looked down
> the driveway in the direction of the screams, he saw a car with its lights off and
> the passenger door open creeping down the driveway.
>
> That same night, around 11:00 p.m., Richard Sussman observed a 1974 or 1975
> vehicle which he believed to be a Chevy Chevelle with its lights off speeding in
> the area of Ashurst and Sherwood Roads.  Mr. Sussman was able to see the
> driver's face.  He also observed the driver was almost sitting in the middle of the
> front seat and was driving with his left hand and holding his right hand behind
> him as if he were holding something down in the back seat of the car.  Mr.
> Sussman gave chase but could not catch up to the vehicle.  When Mr. Sussman
> arrived home, he found his neighbors outside speaking with a man (Mr.
> Aisenstein) who was looking for his daughter whose dog had returned home
> without her.  Subsequently, Mr. Sussman went to the police station with his
> father[, Charles Sussman,] and gave a description of the driver to the police and a
> sketch artist. . . .
>
> On June 27, 1980, the victim's body was found behind St. James Church located
> on Myrtle Avenue in Haverford, Delaware County.  The victim was nude and had
> a multi-colored shirt tied around her face.  A bloody tissue and a button were
> found near the body and submitted to the crime lab for analysis.  Forensic
> pathologist and Delaware County Examiner, Dr. Dmitri Contostavlos[,] ruled the
> victim's death a homicide.  He determined that the victim suffered facial
> lacerations and blunt force trauma to the head consistent with manual battery.
> The victim's neck injuries were also consistent with strangulation.  The victim
> also suffered lacerations to her vagina, with one piercing through the abdominal
> cavity, consistent with injury from a rod-like object.  Dr. Contostavlos conducted
> a rape kit [sic] and collected a hair sample from the victim and submitted the
> evidence to Bi-County Crime Laboratory, which is located in Middleto[w]n
> Township, Delaware County.
>
> On June 28, 1980, the police located [a] Chevy Malibu in the Wynnefield section
> of Philadelphia.  Herman Levin, who was a criminal evidence technician with the
> Philadelphia Police Department, processed the Malibu and collected evidence

including a red stained tissue, a fine gold watch, a small pink and gold elephant charm, a tan and black cushion with blood spatter on the tan side, and a button, which still had the thread attached. Blood spatter was also observed on the vinyl roof interior of the vehicle, on the interior rear passenger door, and on the molding for the metal step into the rear of the vehicle. Testing on this evidence as well as the evidence from the medical examiner was conducted by a serologist from Bi-County Crime Laboratory. It was determined that the blood of two individuals, including the victim, was present in the car. The evidence was then turned over to the evidence custodian of the Haverford Police Department.

Commonwealth v. Perry, No. 907 EDA 2004, slip op. at 1-4, 881 A.2d 888 (Pa. Super. Ct. June 23, 2005) (table) ("2005 Super. Ct. Op.").

### A.     The Affidavit of Probable Cause

According to an affidavit of probable cause dated December 9, 1994, and signed by Sgt. John Miller ("Detective Miller"), the investigation made no progress after 1980 until the Haverford Township Police Department received a letter on March 13, 1992, from Reid Evans. (Aff. Probable Cause at 5.) The affidavit states that Evans said he had shared a cell with Perry for a week in February 1984 when the two were both incarcerated at Huntingdon State Correctional Institution for other matters. (Id. at 5-6.) According to the affidavit, Evans claimed in the letter that Perry had admitted the abduction, rape, and murder of Aisenstein. (Id.)

The affidavit further states that on March 21, 1992, Detective Miller interviewed Richard Sussman, who identified Perry from a photo array as the individual he saw driving the Chevrolet Malibu on the night of the abduction. (Id. at 6.) The affidavit states that the photo used in the array was "similar to the composite drawing done by Philadelphia Police based on description given by *Charles Sussman* in 1980." (Id. (emphasis added).)

The affidavit further states that on March 27 and April 8, 1992, Detective Miller requested that evidence from the case be resubmitted to two police laboratories for scientific analysis. (Id. at 7.) According to the affidavit, one laboratory reported on January 20, 1993, that DNA analysis revealed that an individual other than Aisenstein bled in the Chevrolet Malibu, and

- 3 -

the other laboratory reported on July 8, 1993, that 13 hairs from the resubmitted samples were not consistent with hairs from Aisenstein. (Id.)

The affidavit also states that on December 1, 1993, Detective Miller interviewed Evans. (Id. at 5-6, 7-8.) According to the affidavit, Evans confirmed the statements he had made in his March 13, 1992, letter implicating Perry. (Id. at 7-8.)[2] The affidavit states that on June 23, 1994, Detective Miller and another investigator interviewed Perry. (Id. at 8.) According to the affidavit, when Aisenstein's name was mentioned "Perry's demeanor changed from calm to anxious and nervous and his breathing became shallow and labored," but Perry returned to normal after a minute and a half and then denied any knowledge of the crime in this matter. (Id.) "He volunteered to give samples of his blood and hair, but later said he wanted to have a lawyer give him advice about giving us these samples." (Id.)[3]

### B. The Search Warrant and Suppression Hearing

Based on the affidavit, police obtained a sealed search warrant to withdraw a blood sample from Perry. Perry, 959 A.2d at 934. In 1995, forensic DNA technology unavailable in 1980 enabled police to compare the blood sample from Perry with the preserved blood evidence taken from the Chevrolet Malibu. Id. The DNA testing determined that the blood on the items taken from the vehicle came from two different people: the first was identified as Aisenstein,

---

[2] According to the affidavit, Evans claimed that he did not know Perry prior to being his cellmate. (Id. at 8.) The affidavit states, however, that in a March 25, 1992, interview Jack Gobbler, the owner of the Chevrolet Malibu, identified Evans as one of two men who stole the car from him the night of the abduction. (Id. at 1-2, 6-7.) According to the affidavit, Gobbler identified Evans from a photograph that was similar to a July 5, 1980, composite sketch that had been based on a description by Gobbler. (Id. at 6.)

[3] The affidavit also states that Perry was arrested in 1981 for another murder, burglary, and robbery, for which he was convicted and sentenced to fifteen to thirty years in prison. (Id. at 5.) In addition, the affidavit states that Detective Miller interviewed a witness who implicated Perry in another beating and rape that was alleged to have occurred in the fall of 1980. (Id. at 8.)

and the second was identified as Perry.  Id.  The trial court described the DNA testing, based on

the testimony of Dr. Edward Blake, an expert in forensic serology, as follows:

> Dr. Blake testified that the frequency of the occurrence of the victim's DNA
> [profile] in the population is 1 in 82 trillion people . . . and the frequency of the
> occurrence of the [defendant]'s DNA [profile] in the population was 1 in 370
> million trillion.  Finally, Dr. Blake testified that the current world population is 6
> billion and that in the history of mankind only 8 billion people have inhabited the
> earth.

Commonwealth v. Perry, No. 1239-01, slip. op. at 14, 91 Del. Co. Rep. 515 (Pa. Ct. Com. Pl.

Sept. 14, 2004) ("2004 Trial Ct. Op.").

On September 5 and December 18, 2002, the Court of Common Pleas of Delaware

County held a suppression hearing concerning the search warrant.  Detective Miller, who had

signed the affidavit, had died two years prior to the hearing.  (9/5/02 Suppression Tr. 40:19-20.)

In support of its arguments in favor of the admissibility of the evidence obtained based on the

search warrant, the Commonwealth relied on the testimony of Richard Sussman, Reid Evans, and

Detective David McDonald.[4]  Neither the Commonwealth nor Perry called as witnesses Charles

Sussman or the police sketch artist who had drawn the composite sketch of the driver of the

Chevrolet Malibu in 1980.

Richard Sussman testified at the suppression hearing regarding:  (1) his encounter with

the suspect in 1980; (2) his interview with the police that night; (3) his description of the suspect

to the police sketch artist; and (4) his identification of Perry in 1992.  On direct examination, he

testified that he saw the suspect's face as the suspect drove out of the alley.  (Id. at 11:25-12:2.)

He testified that later that night he provided the description on which the composite sketch of the

---

[4]  Detective McDonald was the police officer who took over the investigation from
Detective Miller in May 1999 when the latter was promoted.  (Id. at 39:4-40:10.)  On direct
examination, Detective McDonald authenticated documents on which the search warrant and
affidavit of probable cause were based.  (Id. at 41:3-51:21.)

suspect was based.  (Id. at 15:2-4.)  He testified that the police sketch artist asked him questions concerning the suspect's features, he described how the suspect appeared, and the police sketch artist drew it.  (Id. at 15:12-16:5.)  He testified that afterward the police sketch artist showed him a composite sketch and he agreed it was "what the man looked like."  (Id. at 16:3-5, 18:7-11.)

Perry's counsel then cross-examined him concerning the written record of his police interview.  (12/18/02 Suppression Tr. at 6-11.)  In response to a question regarding whether he recalled the interview, he testified that he did, and he added that "[i]t was me and my father that was interviewed at the same time."  (Id. at 6:20-24.)  When asked if the report of the interview stated that he had seen the back of the suspect's head, he testified that "they interviewed me and my father jointly" and "my father said that he had saw from the back."  (Id. at 7:21-22.)  He later reiterated that it was a "joint interview" and stated that "[t]he officer who took this did not discern who was saying what."  (Id. at 9:16-20.)  He then explained the differences between what he and his father had seen:

> It was my father that had seen the back – earlier where it says, in the paragraph portion of this where it says it was seen from the back, that was actually my father describing what he saw.  I saw, when we were window – car window to car window, [the suspect] holding down something with his right arm, sitting towards the middle of the seat.  And then went – when we looked toward each other for those few seconds.

(Id. at 10:1-8.)

On re-direct examination, the prosecutor read to Richard Sussman a portion of the record of the interview that said "description of male, parentheses, I saw male from the rear, possibly wearing a white t-shirt, race unknown."  (Id. at 11:14-15.)  The prosecutor asked him, "Who said those words?" and he replied, "My father."  (Id. at 11:15.)  He then explained how he knew that his father had said those words, not him:

Q.    And how do you know that you didn't say those words?

- 6 -

A.      Because I – I remember saying during the questioning and answering part, and I remember my father telling me what he saw.  You know comparing what each other had witnessed.

Q.      So those words that are typed there aren't yours?

A.      Correct.

Q.      Even though it says Richard Sussman, 19.

A.      Yes.

(Id. at 11:18-23.)  He then testified that, after he had been unable to identify Perry in a mug book, he "sat down with the Philadelphia Police Sketch Artist" and "described to the sketch artist, the person who [he] had seen driving the Malibu."  (Id. at 12:9-11, 13:13-18.)

On re-cross, Perry's counsel focused on the discrepancy between Richard Sussman's description of the suspect as having a "very light goatee" and the copy of the composite sketch that had been entered as an exhibit at the suppression hearing.  (Id. at 13:23-14:20.)  Richard Sussman did not know why the light goatee he thought he had described did not "show up" on that copy:  "I couldn't tell you why it's not on that particular copy that I'm looking at right there."  (Id. at 14:18-20.)

Perry's counsel then questioned Reid Evans, who admitted to having written the 1992 letter that implicated Perry in the abduction, rape, and murder of Aisenstein.  (12/8/02 Suppression Tr. at 16:5-10.)  Evans testified that he did not sign the letter but did not know why he did not sign it.  (Id. at 16:24-17:2.)  He testified that, after he sent the letter to Detective Frederick Westerman in Philadelphia, he was interviewed two times by Detective Miller in connection with the letter and once by another person.  (Id. at 17:3-10, 18:14-15.)  He testified, however, that after he provided a statement to Detective Miller, he attempted to recant the statement by claiming that he might have been confusing the Aisenstein case with the "original case" for which Perry was incarcerated.  (Id. at 19:14-20:13.)  In response to the question from

Perry's counsel, "Why did you write the letter in the first place if it wasn't the truth?" Evans responded, "Because at first I thought I was, you know, I thought I was doing a good deed and second, I didn't like Perry because he stole something out of my cell." (Id. at 23:21-24:1.)

On cross examination by the prosecutor, Evans testified that he was currently incarcerated in Graterford prison with Perry and that he had been transported to the courthouse with Perry that day. (Id. at 30:4-31:13.) Evans also testified that before he wrote the letter implicating Perry in the abduction, rape, and murder of Aisenstein, he had not had any contact with Detective Miller. (Id. at 31:24-32:12.) Evans admitted that the letter named Aisenstein and that in it Evans described how he questioned Perry about the Aisenstein case because Evans had recognized at the time that the Aisenstein case was "very similar" to the case for which Perry was incarcerated. (Id. at 33:20-34:11.) Evans admitted that in the letter he stated that Perry asked him, "how did I know about his case and said that police could not prove how he got from San Diego, California Naval Base to the Philadelphia area, and he said that he took a plane back." (Id. at 34:12-15.) Evans further admitted that when he was first interviewed by Detective Miller, he told Detective Miller that he had written the letter and that it was true. (Id. at 35:6-15.) He also admitted telling Detective McDonald in September 2000 that he had written the letter, but testified that he told Detective McDonald that he was mixing up the two cases. (Id. at 36:5-37:5.)

Detective McDonald was then called to the stand by the prosecutor and testified that Evans told him in a September 28, 2000, interview that he did not wish to discuss the letter because "he didn't want to be labeled as a snitch":

> He stated he did not wish to discuss this letter because he did not want to focus on it at this time due to the fact that he and his brother had to live in prison and he didn't want to be labeled as a snitch. I asked him, did you write this letter and he said, yes. I said, these are your words and he said, yes. I said, how about if you sign it and he said, I'm not going to sign it because me and my brother have to live here.

(Id. at 39:10-18.)  Detective McDonald testified that Evans never told him that what was in the letter was false.  (Id. at 39:19-21, 40:13-15.)  Detective McDonald also testified that in his discussions with Detective Miller about the case, Detective Miller never told him that Evans had said that what was in the letter was false.  (Id. at 40:6-12.)  The prosecutor then examined Detective McDonald regarding Detective Miller's report of a December 9, 1993, interview of Evans.  (Id. at 40:16-43:10.)  Detective McDonald testified that there was nothing in the report stating that what was in the letter was false.  (Id. at 40:23-41:1.)  Detective McDonald testified that, in fact, according to the report Evans stated as follows: "[Perry] said he done it and the police can't prove it.  He was in the Navy at the time and he got back to Philadelphia by Navy airplane.  I'm not sure if it was a Navy airplane hop or a regular airplane."  (Id. at 43:5-8.)  On cross-examination, Perry's counsel asked Detective McDonald, "Mr. Evans never told you that he was declining to verify the contents of that letter?" to which Detective McDonald responded, "Absolutely not."  (Id. at 43:17-20.)

On January 6, 2003, Perry filed a memorandum of law in support of his Omnibus Pre-Trial Motion with regard to his claim that the DNA evidence should be suppressed because there was a lack of probable cause for the search warrant.  Perry argued that Evans had "repudiated his written and spoken allegations about Perry's culpability," but that the affidavit of probable cause nevertheless omitted references to Evans's repudiation.  (Mem. in Supp. of Omnibus Pre-Trial Mot. 2-3.)  Perry argued that this omission "allowed the issuing authority to overlook the flawed nature of Richard Sussman's photo identification" of Perry, when Richard Sussman "demonstrated the miraculous recall" of Perry's face in a photo array "shown to him almost twelve years after he allegedly viewed the defendant [face] to face for about three seconds" when the defendant was allegedly driving a car at night at a high rate of speed.  (Id. at 3-4.)  Perry further argued that the photo array was unduly suggestive and that the affidavit of probable cause

failed to mention that on the night of the abduction Richard Sussman was unable to identify Perry from a mug book. (Id. at 4.)

On February 5, 2003, the suppression court denied Perry's motion to suppress the DNA evidence obtained through the search warrant,

> it appearing that Defendant has not proved that Detective Miller made a misstatement of fact that was both deliberate or material in either the Affidavit of Probable Cause or in the Application for the Search Warrant, and it also appearing that under the totality of the circumstances the Search Warrant was supported by probable cause, and it appearing that this Court does not credit the recantation testimony of Reid Evans, and it further appearing that this Court has determined that the photo array shown to Richard Sussman was not suggestive.

Commonwealth v. Perry, No. 1239-01, Order 1-2 (Pa. Ct. Com. Pl. Feb. 5, 2003) ("Feb. 5, 2003 Suppression Ct. Order").

### C.     Perry's Trial and Appeals in State Court

#### 1.     Perry's Trial and Direct Appeal

At trial, the Commonwealth built its case largely on (1) the 1992 photographic identification of Perry by Richard Sussman, (2) similarities between a 1980 photograph of Perry and the composite sketch prepared by the police sketch artist, and (3) the DNA evidence. Perry, 959 A.2d at 934.[5] On September 25, 2003, Perry was convicted of first-degree murder, kidnaping, involuntary deviate sexual intercourse, and rape in connection with the death of Aisenstein. Perry, 959 A.2d at 934. On September 30, 2003, Perry was sentenced to life in prison without parole on the murder charge, and an aggregate sentence of thirty to sixty years'

---

[5] At trial, as at the suppression hearing, Richard Sussman testified that he was the source of the description on which the composite sketch was based. (9/22/03 Trial Tr. 119:2-120:7, 128:15-19.) On cross-examination at trial, Richard Sussman testified that his father was with him when he provided the description to the police sketch artist. (Id. at 143:22-144:2.)

imprisonment on the remaining convictions, to run consecutively and consecutively to two prior sentences.[6] Id. The trial court denied Perry's post-sentence motions. Id.

Perry appealed his conviction to the Superior Court on March 30, 2004, claiming that the trial court erred by:

(1) admitting "testimony concerning DNA evidence, since the chain of custody was not established concerning the items from which the DNA was allegedly obtained during a 12 year period from 1980 to 1992," which resulted in a Due Process violation;

(2) precluding a supplemental set of written interrogatories from being "submitted to the jury pool to address the issues of race and the effect of DNA evidence";

(3) failing to suppress the 1992 identification of Perry "by Richard Sussman since that identification was tainted due to the procedures used by the police in dealing with [Richard Sussman] and his father" and "in addition the use of that identification violated Mr. Perry's Due Process and Confrontation Rights";

(4) failing "to suppress the search warrant and all evidence derived from the warrant because Detective Miller was unavailable to testify," which resulted in a Due Process violation and a Confrontation Clause violation; and

(5) failing "to suppress the search warrant due to the Commonwealth's failure to unseal the search warrant," which resulted in a Due Process violation.

(Statement of Matters Complained of on Appeal, Apr. 12, 2004).

In a September 14, 2004, opinion affirming its judgment of sentence, the trial court stated that it did not err when it did not suppress the identification of Perry by Richard Sussman based on the factors of reliability set forth in Commonwealth v. Moore, 633 A.2d 1119 (Pa. 1993). 2004 Trial Ct. Op. 20-21. In addition, the trial court stated that it did not err when it did not suppress the evidence obtained through the search warrant and that Perry's Due Process and

---

[6] At the time of his 2003 sentencing, Perry was already serving his sentence of fifteen to thirty years for his previous third-degree murder, robbery, and burglary conviction and an additional, consecutive sentence of five to ten years for his previous rape and robbery conviction. Id. at 934 n.2.

Confrontation Clause rights under Crawford v. Washington, 541 U.S. 36 (2004), were not violated, because the witnesses upon whose statements the affidavit of probable cause was based, Richard Sussman and Reid Evans, were both called to the stand. Id. at 22-23. The trial court stated that it was within its discretion when (1) it did not find credible the testimony of Evans repudiating the letter he had written that implicated Perry and (2) it found the testimony of Richard Sussman and Detective McDonald credible instead. Id. at 24-25.

On June 23, 2005, the Superior Court affirmed Perry's sentence. 2005 Super. Ct. Op. 8. As to the issues that Perry raised, including "[w]hether the trial court erred when it failed to suppress the identification of [Perry] by Richard Sussman since the identification was tainted due to procedures used by police in dealing with Mr. Sussman and his father and in addition the use of that identification violated [Perry's] due process rights" and "[w]hether the trial court erred when it failed to suppress the search warrant and all evidence derived from the warrant because Detective Miller was unavailable to testify," the Superior Court stated that it was "in agreement with the trial court's disposition and affirm on its well-reasoned twenty-nine page opinion dated September 14, 2004." Id. at 6-7. The Superior Court adopted the trial court's opinion as its own for purposes of further appellate review. Id. at 7.

Perry sought allocatur from the Pennsylvania Supreme Court, which the Court denied on December 29, 2005. Perry, 959 A.2d at 934.

## 2.    Perry's PCRA Petition and PCRA Appeal

On February 1, 2006, Perry sought relief under the Post-Conviction Relief Act (the "PCRA"), 42 Pa. C.S. §§ 9541-46. Perry, 959 A.2d at 934. He claimed: (1) prosecutorial misconduct because the prosecutor elicited allegedly false testimony at trial that Richard Sussman and not Charles Sussman was the source of the description on which the composite sketch was based; (2) ineffective assistance of counsel as a result of his trial counsel's failure to

object to the prosecutorial misconduct at trial and as a result of his appellate counsel's failure to raise this issue on appeal; and (3) trial court error "in each and every phase of the trial proceedings," including allowing Richard Sussman to testify falsely concerning the composite sketch and misrepresenting in its 2004 opinion that Richard Sussman testified that he "was brought to the police station and interviewed without his father being there with him." (Motion for Post Conviction Collateral Relief, March 7, 2006 ("PCRA Petition"), 4-8.)[7]

Perry's court-appointed PCRA counsel filed a "no merit" letter pursuant to Commonwealth v. Turner, 544 A.2d 927 (Pa. 1988), and Commonwealth v. Finley, 550 A.2d 213 (Pa. Super. Ct. 1988), and requested to withdraw. ("No Merit" Letter, March 14, 2007.) In the "no merit" letter, Perry's PCRA counsel listed Perry's PCRA claims, including several claims in addition to those set forth above, such as that Perry's trial counsel "rendered ineffective assistance [by] failing to call John Collins [the police sketch artist] as a defense witness at trial." (Id. at 4.)[8]

Perry's PCRA counsel stated that Perry's appeal had no merit. Id. at 5. He noted that "Richard Sussman's alleged misidentification, its unduly suggestive nature[,] and otherwise the unreliability of the same, was one of the paramount issues litigated at the trial stage and on direct appeal." Id. at 8. Citing to both the suppression hearing and the trial, Perry's PCRA counsel

_____

[7] Perry's PCRA claim also included several issues not pertinent to the instant habeas claim, including that the trial court erred by admitting the composite sketch and the photo of Perry from the photo array into evidence, by allowing the prosecutor to show the jury enlargements of photographs, and by permitting the jury to take the composite sketch into the jury room. Id.

[8] The "no merit" letter lists two other additional claims: (1) Perry's trial and appellate counsel rendered ineffective assistance by "failing to properly challenge the illegality of the search warrant that was obtained on or about December 29, 1994, the same being sealed for nearly six and one-half years prior to Defendant's arrest"; and (2) "counsel rendered ineffective assistance [by] failing to properly object to the admission of certain DNA testing procedures and results[.]" Id. at 5.

stated that "Mr. Sussman was brought to Philadelphia West Detectives, along with his father, and provided descriptive information of the suspect to law enforcement, including the same to a police sketch artist[.]" Id. In addition, Perry's PCRA counsel stated that "[i]t is clear from the pre-trial record that trial counsel zealously moved for the preclusion of Richard Sussman's identification testimony[.]" Id. at 9. Perry's PCRA counsel noted that, among other ways in which Perry's counsel challenged the identification testimony, the cross-examination of Richard Sussman on the second day of the suppression hearing chiefly related "to the circumstances of a police report that suggested that a joint statement was provided by Mr. Sussman and his father at the police station soon after the 1980 incident" and that "Mr. Sussman unequivocally stated that he and his father were interviewed by the police at the same time[.]" Id. Perry's PCRA counsel stated that, having raised "the identification issue at pre-trial," having objected to the admission of enlargements of the composite sketch and the photo of Perry from the photo array, and having "repeatedly suggested during [his] cross-examination of Mr. Sussman and in his closing argument that said identification should not be considered as reliable," Perry's counsel could have done "nothing more." Id.

As to the failure to call the police sketch artist as a defense witness at trial, Perry's PCRA counsel stated that Perry's trial counsel "was able to sufficiently argue . . . during his closing statement to the jury" the "discrepancies" concerning "the absence of the goatee from the actual sketch" and which Sussman (father or son) may have provided the police sketch artist "with particular pieces of information when preparing the composite drawing." Id. at 10. According to Perry's PCRA counsel, "it is likely that the sketch artist would have had difficulty in recollecting the actual meeting where he drew the sketch, the same occurring some 23 years ago." Id. Perry's PCRA counsel concluded that "[t]he identification evidence, in conjunction with the forensic

DNA evidence presented at trial, would not have been rebutted if the defense had the opportunity to question the police sketch artist." Id.

On July 19, 2007, the PCRA court granted Perry's PCRA counsel's motion to withdraw and denied the PCRA petition without a hearing. Commonwealth v. Perry, No. 1239-01, slip op. at 8 (Pa. Ct. Com. Pl. July 19, 2007) ("2007 PCRA Court Order"). The PCRA court found that Perry had already raised the issue of the admissibility and authentication of the composite sketch in post-sentence motions and on appeal, and that therefore Perry was precluded from raising the issue under the guise of an ineffective assistance of counsel claim. Id. at ¶¶ 33-35. The PCRA court also found, *inter alia*, that: (1) "[t]here is no evidence presented in the PCRA Petition nor was there any evidence presented at or prior to trial that Mr. Sussman's testimony regarding his identification of Petitioner was false or that the prosecuting attorney knew or should have known that he was presenting false testimony to the jury"; (2) "[b]oth claims of Trial Court and prosecutorial misconduct are bald allegations, which are without merit"; (3) "Trial Counsel argued on numerous occasions to have both the police sketch and Mr. Sussman's proposed testimony precluded from the Commonwealth's evidence at trial"; (4) "Petitioner's Counsel cross-examined Mr. Sussman about the identity of Petitioner and the description [that] yielded the police sketch and Trial Counsel[] argued during his closing statements and called into question the reliability of Mr. Sussman's identification of Petitioner and the police sketch"; and (5) "[t]here is no evidence presented by Petitioner if Trial Counsel had called the police sketch artist to testify his testimony would have been at all beneficial to Petitioner's case" because "Mr. Sussman, who provided the information [that] produced the sketch, testified as to whom he provided the information to, and in fact identified Commonwealth's Exhibit C-10[] as the sketch the police officer drew as a result of information he provided" and the testimony of the police sketch artist "would have only boosted the Commonwealth's evidence against Petitioner." Id. at

¶¶ 22, 38, 41, 43. In addition, the PCRA court noted that Perry "was not convicted solely based on evidence presented via Mr. Sussman's identification or the police sketch" because the jury was also provided "with comprehensive evidence regarding DNA evidence of Petitioner's as being found at the scene." Id. at ¶ 45.

Perry appealed the denial of his PCRA petition to the Superior Court, claiming that:

(1)     Perry's trial counsel provided ineffective assistance by failing to:
        (a) "object to the testimony of Richard Sussman on the basis that the
        search warrant affidavit named Charles Sussman, rather than Richard
        Sussman, as the person who provided the description to the sketch artist";
        and (b) "call the police sketch artist as a witness";

(2)     Perry's appellate counsel provided ineffective assistance by failing to raise
        the issue of the ineffectiveness of Perry's trial counsel;

(3)     Perry's PCRA counsel provided ineffective assistance by failing to:
        (a) raise the issue of the ineffectiveness of Perry's trial counsel and
        appellate counsel; (b) "investigate the police sketch artist files" and
        "request an evidentiary hearing to determine if the sketch artist testimony
        would have been beneficial" to Perry; and (c) list in the Turner/Finley
        letter each issue Perry "wanted the PCRA court to review and . . . why
        each issue was meritless";

(4)     the prosecutor committed misconduct "by knowingly and intentionally
        presenting the allegedly false testimony of Richard Sussman to the jury"
        and, in his closing argument, "improperly emphasizing the composite
        sketch";

(5)     the PCRA court erred by denying the PCRA petition without an evidentiary
        hearing "as to whether trial counsel had a reasonable basis for failing to call the
        sketch artist as a witness"; and

(6)     the suppression court erred by "accepting the testimony of Richard Sussman
        without proof that Richard Sussman provided the description to the police
        sketch artist[.]"

Perry, 959 A.2d at 935.[9]  In a December 12, 2007, opinion, the PCRA court affirmed its denial of

Perry's PCRA petition, reiterating the findings and conclusions from its July 19, 2007, order

almost word for word.  Commonwealth v. Perry, No. 1239-01, slip op. at 5-10 (Pa. Ct. Com. Pl.

Dec. 12, 2007) ("2007 PCRA Court Op.").

On September 15, 2008, the Superior Court affirmed the PCRA court's dismissal of the

PCRA petition.  Id. at 939.  The Superior Court noted that each of Perry's claims focused "on a

discrepancy between the search warrant affidavit and testimony presented at trial":

> Specifically, Appellant emphasizes that the search warrant affidavit lists Charles
> Sussman, not Richard Sussman, as the individual who provided the description
> for the composite sketch drawn in June of 1980.  At trial, Richard Sussman
> testified that he provided the description, not his father. . . . Richard Sussman
> repeatedly testified that he and his father were interviewed together by police, and
> that his father was present when he, Richard Sussman, provided the description to
> the police sketch artist.

Id. at 935 (citing 12/18/02 Suppression Tr. at 6-10; 9/22/03 Trial Tr. at 118-19, 140, 143, 144).

The Superior Court concluded that, although "[t]he issue of the admissibility and authentication

of the composite sketch was previously litigated in post-sentence motions and on direct appeal,"

the PCRA court erred when it concluded that Perry was precluded from raising the issue in his

PCRA petition under the guise of an ineffective assistance of counsel claim.  Id. at 936 (citing

Commonwealth v. Collins, 888 A.2d 564, 573 (Pa. 2005) (holding that a claim of ineffectiveness

of counsel is a discrete legal ground and not merely an alternative theory in support of an

underlying issue that was raised on direct appeal)).  The Superior Court therefore addressed on

---

[9]  "[F]or clarity purposes," the Superior Court discerned, summarized, and re-ordered the
issues for which Perry was seeking review, using the "Summary of Argument section" of his
appellate brief as its basis rather than the "Statement of Questions section."  Id. at 935 n.5.  This
list is also, effectively, a clarification and summary of the concise statement of matters
complained of on PCRA appeal that Perry submitted under Pa. R. App. P. 1925(b).  (See
Petitioner's Concise Statement of Matters Under Pa. R. App. P. 1925(b) ("1925(b) PCRA
Concise Statement"), Oct. 9, 2007.)

their merits Perry's ineffective assistance of counsel claims regarding the alleged failure of his trial counsel to call the police sketch artist as a witness and the alleged failure of his PCRA counsel to investigate this claim more extensively.  Perry, 959 A.2d at 936.

The Superior Court concluded that the PCRA court erred in holding that Perry's trial counsel had a reasonable basis for not calling the police sketch artist as a witness at trial.  Id. at 937.  The Superior Court found that Perry's PCRA counsel was engaging in "speculation" when he concluded that "trial counsel's closing remarks acted as a sufficient substitute for the testimony of the sketch artist."  Id.  Perry's PCRA counsel did not interview the police sketch artist to rule out the possibility that the police sketch artist might have provided an opportunity to impeach Richard Sussman's testimony, and Perry's PCRA counsel did not state that his attempts to contact or locate the police sketch artist were futile.  Id.  The Superior Court therefore "specifically disapprove[d]" of Perry's PCRA counsel's speculation – and of the PCRA court's acceptance of that speculation – that the police sketch artist "would have had difficulty in recollecting the actual meeting where he drew the sketch" and that Perry's trial counsel "was able to sufficiently argue" in his closing statement that there was a discrepancy as to which Sussman may have provided the police sketch artist with the description that formed the basis for the composite sketch.  Id.

Nevertheless, the Superior Court agreed with Perry's PCRA counsel that Perry's claim regarding the police sketch artist had no merit.  Id.  The DNA evidence placed Perry in the car fleeing the scene of the crime, Perry's trial counsel cross-examined Richard Sussman at trial about the discrepancies in his identification of Perry, and Perry's trial counsel argued to the jury that the identification was unreliable.  Id.  The Superior Court concluded that Perry had not shown that he was prejudiced by his trial counsel's ineffectiveness as to this claim.  Id. at 938. "In the face of overwhelming evidence against [Perry], we cannot conclude that he was

sufficiently prejudiced by trial counsel's failure to subpoena the sketch artist." Id.  Perry did not

seek allocatur.  (Resp. 6.)

### D.  Perry's Habeas Petition

On June 17, 2009, Perry filed the instant habeas petition, based on the following grounds:

Ground One:  the search warrant (a) lacked probable cause in violation of the
Fourth Amendment, (b) violated Perry's Fifth and Fourteenth Amendment rights
to a fair procedure and due process, and (c) violated Perry's Sixth Amendment
Confrontation Clause rights;

Ground Two:  the photo array used in the 1992 identification was unduly
suggestive and prejudicial in violation of Perry's Due Process and Confrontation
Clause rights;

Ground Three:  the admission of the DNA evidence was "speculative" and
therefore violated Perry's Due Process and Confrontation Clause rights;

Ground Four:  Perry's counsel provided ineffective assistance by failing to
(a) move for suppression of the 1992 identification, (b) object at the suppression
hearing to prosecutorial misconduct in eliciting false testimony from Richard
Sussman despite a conflict between that testimony and the affidavit of probable
cause, which stated that Charles Sussman provided the description on which the
composite sketch was based, and (c) call the police sketch artist at the suppression
hearing and/or subpoena the files related to the composite sketch.

(Pet. 9-10.)  On November 19, 2009, the Magistrate Judge recommended that all of Perry's

habeas claims be dismissed or denied without an evidentiary hearing.  On December 22, 2009,

Perry filed objections to the Magistrate Judge's Report and Recommendation with respect to

Grounds One (a) and (c), Ground Two, and Grounds Four (a) through (c).[10]

## II.  Legal Standards

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C.

§ 2254, governs the court's review of the instant petition.  Under AEDPA, a "district court shall

---

[10]  Perry did not object to the Report and Recommendation with respect to Grounds
One (b) and Three.  The court will, accordingly, approve and adopt the Report and
Recommendation as to these claims.

entertain an application for a writ of habeas corpus [on] behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." Id. § 2254(a). Where a habeas petition has been referred to a magistrate judge for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B), the district court reviews *de novo* "those portions of the report or specified proposed findings or recommendations to which objection is made." Id. § 636(b)(1). After conducting such a review, this court "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate." Id.

### A.    Standards Under AEDPA for Review of Claim on the Merits

Habeas relief is unavailable "with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim . . . resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law," § 2254(d)(1), or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," § 2254(d)(2).

A state court's adjudication of a claim is "contrary" to clearly established federal law if the state court has applied a rule that contradicts the governing law set forth in United States Supreme Court precedent or if the state court confronts a set of facts that are materially indistinguishable from a decision of the Supreme Court and the state court arrives at a different result. Williams v. Taylor, 529 U.S. 362, 405-06 (2000). In determining whether a state court's decision was contrary to federal law, the habeas court should give the state court decision "the benefit of the doubt" and not be quick to attribute error. Wooford v. Visciotti, 537 U.S. 19, 24 (2002). It is not necessary that the state court cite or even be aware of the governing federal precedent. Early v. Packer, 537 U.S. 3, 8 (2002). All that is required for denial of habeas relief

on this ground is that "neither the reasoning nor the result of the state-court decision contradicts" federal precedent.  Id.

A state court's adjudication of a claim "involve[s] an unreasonable application" of clearly established federal law if the state court correctly identifies the governing legal rule but applies the rule unreasonably to the facts of the petitioner's case.  Williams, 529 U.S. at 407-08.  The test for unreasonable application is whether the state court's application of federal precedent was objectively unreasonable.  Id. at 409.[11]

## B.    Standards for Exhaustion of State Remedies and Procedural Default

Prior to reaching the merits of a claim under AEDPA, however, the court must first determine whether the petitioner's claims are properly before it.  The court cannot grant habeas relief under § 2254 "unless the petitioner has 'exhausted the remedies available in the courts of the State.'"  Leyva v. Williams, 504 F.3d 357, 365 (3d Cir. 2007) (quoting 28 U.S.C. § 2254(b)(1)(A)).  "Absent exceptional circumstances, the petitioner must first present all of his constitutional claims in the state system, through the highest state tribunal, before seeking relief in federal court."  Wheeler v. Pa. Bd. of Probation and Parole, No. 06-0559, 2007 WL 1366888, at *4 (E.D. Pa. May 4, 2007) (internal citations omitted).[12]  The requirement of exhaustion is

---

[11]  Meanwhile, a state court's adjudication of a claim is "based on an unreasonable determination of the facts" if it is "objectively unreasonable in light of the evidence presented in the state-court proceeding."  Miller-El v. Cockerell, 537 U.S. 322, 340 (2003).  Even if a habeas court "disagree[s] with a state court's credibility determination," id. at 340, the habeas court must presume any findings of fact made by the state court to be correct unless the petitioner presents clear and convincing evidence to rebut this presumption.  28 U.S.C. §§ 2254(d)(2) and (e)(1); see also Wiggins v. Smith, 539 U.S. 510, 528 (2003) (rejecting state court's factual determination under § 2254(d)(2) and (e)(1)).

[12]  Generally, a petitioner in a PCRA action need not seek review with the Pennsylvania Supreme Court to exhaust a claim.  Lambert v. Blackwell, 387 F.3d 210, 233-34 (3d Cir. 2004) (holding that the Pennsylvania Supreme Court is "unavailable" for purposes of exhaustion because that court, by its own order, does not require a petitioner to petition for allocatur from an adverse Superior Court ruling in order to exhaust).  A petitioner typically only needs to present

"grounded in principles of comity . . . [giving] States . . . the first opportunity to address and correct alleged violations of [a] state prisoner's federal rights." Coleman v. Thompson, 501 U.S. 722, 731 (1991).

Thus, "[a]ll claims that a petitioner in state custody attempts to present to a federal court for habeas corpus review must have been fairly presented to each level of the state courts." Lines v. Larkins, 208 F.3d 153, 159 (3d Cir. 2000) (citing 28 U.S.C. § 2254(b) and O'Sullivan v. Boerckel, 526 U.S. 838, 848 (1999) ("[W]e ask not only whether a prisoner has exhausted his state remedies, but also whether he has *properly* exhausted those remedies, i.e., whether he has fairly presented his claims to the state courts.") (emphasis in original)). To fairly present claims, "a petitioner must 'present a federal claim's factual and legal substance to the state courts in a manner that puts them on notice that a federal claim is being asserted.'" Bronshtein v. Horn, 404 F.3d 700, 725 (3d Cir. 2005) (quoting McCandless v. Vaughan, 172 F.3d 255, 261 (3d Cir. 1999)).

If, however, a petitioner "failed to exhaust state remedies and the court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred . . . there is procedural default for purposes of federal habeas . . . ." Coleman, 501 U.S. at 735 n.1. "A federal court cannot grant relief where the petitioner 'has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule.'" Id. at 749. For example, "[i]f a bypassed state remedy is no longer available because it is time-barred due to a state limitations period, the petitioner will be

---

the claim to the Pennsylvania Superior Court. See Williams v. Folio, No. 07-1099, 2008 WL 336306, at *3 (E.D. Pa. Feb. 4, 2008) (stating that "a habeas petitioner successfully exhausts a claim by bringing it to the Superior Court either on direct appeal or during PCRA proceedings").

deemed to have procedurally defaulted those claims." <u>Stidham v. Varano</u>, No. 08-3216, 2009 WL 1609423, at *24 (E.D. Pa. June 9, 2009) (citing <u>O'Sullivan</u>, 526 U.S. at 848).[13]

##### C.    Standards for Ineffective Assistance of Counsel Claim

To establish an ineffective assistance of counsel claim sufficient to warrant habeas relief, a defendant must show that:  (1) his attorney's performance was deficient; and (2) the deficient performance prejudiced his defense.  <u>Strickland v. Washington</u>, 466 U.S. 668, 687 (1984).

To prove deficiency, the first prong of the <u>Strickland</u> test, a defendant must show that counsel's performance "fell below an objective standard of reasonableness under prevailing professional norms." <u>Buehl v. Vaughn</u>, 166 F.3d 163, 169 (3d Cir. 1999) (citing <u>Strickland</u>, 466 U.S. at 688).  The Supreme Court has also explained that "[j]udicial scrutiny of counsel's performance must be highly deferential." <u>Strickland</u>, 466 U.S. at 689.  There is "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." <u>Id.</u> at 689 (quoting <u>Michel v. Louisiana</u>, 350 U.S. 91, 101 (1955)).

To prove prejudice, the second prong of the <u>Strickland</u> test, a defendant must demonstrate that "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." <u>Strickland</u>, 466 U.S. at 687.  "It is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding." <u>Id.</u> at 693.  Rather, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." <u>Id.</u> at 694.

---

[13] AEDPA features a one-year statute of limitations for federal habeas petitions.  28 U.S.C. § 2244(d).  AEDPA states, in pertinent part, that the limitation period shall run from the latest of "the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review." <u>Id.</u>

### III.    Discussion

Applying these standards, the court concludes that Perry's habeas petition must be rejected.  First, Perry's claim under the Fourth Amendment that the search warrant was issued without probable cause is procedurally defaulted and, regardless, non-cognizable.  Second, Perry's claim that his Sixth Amendment right to confront witnesses was violated at the suppression hearing fails because no Confrontation Clause issues were implicated.  Third, the trial court and Superior Court's rejection of Perry's claim that the photo array shown to Richard Sussman was unduly suggestive was not contrary to nor an unreasonable application of federal law.  Fourth, Perry's claim that his counsel was ineffective because he allegedly failed to move for suppression of Richard Sussman's identification of Perry fails because the claim is factually wrong, procedurally defaulted, and, regardless, lacking in merit.  Fifth, Perry's claim that his counsel was ineffective by failing to object at the suppression hearing when the prosecutor allegedly elicited false testimony that Richard Sussman, not Charles Sussman, provided the description of the suspect to the police sketch artist fails because Perry has not made a showing that the testimony was false or that the prosecutor knew or should have known that it was false.  Finally, Perry's claim that his counsel was ineffective in failing to subpoena the police sketch artist or the police sketch artist's files fails because it is lacking in merit and procedurally defaulted.

### A.    Ground One (a):  Perry's Claim That the Search Warrant Was Issued Without Probable Cause in Violation of the Fourth Amendment is Procedurally Defaulted and, Regardless, Non-Cognizable

In Ground One (a), Perry claims that the search warrant was issued without probable cause in violation of his Fourth Amendment rights.  (Pet. 9.)  He alleges that it was based on the false testimony of Evans and the unduly suggestive photo array identification.  (Id.)  The Magistrate Judge recommended that this claim be denied because Perry did not present it in his

direct appeal or in his PCRA proceedings. (Report & Recommendation ("R&R") 7.) According to the Magistrate Judge, Perry has not exhausted his state remedies regarding this claim because Perry never presented this claim to any state appellate court. (Id.) The Magistrate Judge also recommended that this claim be denied because Perry is now time-barred from raising it in any new PCRA petition. (Id.) Perry's conviction became final on March 29, 2006, upon the expiration of the ninety day period to seek a writ of certiorari from the United States Supreme Court after the Pennsylvania Supreme Court denied review of his direct appeal on December 29, 2005. 42 Pa. C.S. § 9545(b)(1), (3); S. Ct. R. 13(1). Under this analysis, the time in which Perry could have filed a PCRA petition as to this claim would have expired on March 29, 2007, as AEDPA has a one-year statute of limitations. 28 U.S.C. § 2244(d). Thus, the claim is procedurally defaulted.

Perry objects by arguing that he did present the claim properly in the state courts. (Objections 2.) Perry argues that (1) the issue was "contextually interwoven" with the issue of Detective Miller's unavailability to testify at the suppression hearing, and (2) Perry tried to have the issue "re-raised" in his PCRA petition as part of his ineffective assistance of counsel claim, but his PCRA counsel failed to list it in the Turner/Finley letter. (Id.)

Perry's arguments are insufficient to overcome his procedural default. His only claims on direct appeal concerning the search warrant related to (1) Due Process and Confrontation Clause claims regarding Detective Miller's unavailability to testify at the suppression hearing due to his death and (2) a Due Process claim regarding the Commonwealth's failure to unseal the search warrant. These two claims are different from the Fourth Amendment issue that Perry raises in the instant petition of whether there was probable cause when the government obtained the search warrant in 1994. Perry did not raise the probable-cause claim at issue here on direct appeal. He is time-barred from raising it in any new PCRA petition. In addition, he has not

raised any objection to the Magistrate Judge's conclusion regarding the time-bar as to this claim. Accordingly, the probable-cause claim is procedurally defaulted.

Even if it could be said that Perry had fairly presented this Fourth Amendment probable-cause claim in the state courts, well-settled Supreme Court precedent establishes that the claim is not cognizable on habeas review. Claims that a state court improperly failed to suppress evidence as being the product of an illegal search or seizure cannot be re-litigated on habeas corpus if the state court provided a full and fair opportunity for a hearing during the trial stage and direct review. Stone v. Powell, 428 U.S. 465, 494 (1976). "[W]here the State has provided an opportunity for full and fair litigation of a Fourth Amendment claim, a state prisoner may not be granted federal habeas corpus relief on the ground that the evidence obtained in an unconstitutional search or seizure was introduced at his trial." Id. (footnotes omitted); see also Wright v. West, 505 U.S. 277, 293 (1992) (reiterating that claims that evidence was obtained in violation of the Fourth Amendment "are not cognizable on habeas as long as the courts have provided a full and fair opportunity to litigate them at trial or on direct review.")

A petitioner has had a full and fair opportunity to litigate his or her Fourth Amendment claim if the state has an available mechanism for suppressing evidence seized in or tainted by an illegal search or seizure. Marshall v. Hendricks, 307 F.3d 36, 82 (3d Cir. 2002). Here, the trial court held a suppression hearing over two days – September 5 and December 18, 2002 – at which Perry had the explicit opportunity to address any issues he may have had concerning the search warrant. He also could have, but did not, raise the Fourth Amendment suppression issue on his direct appeal. Thus, Perry had a full and fair opportunity to litigate his probable cause claim. Id. (whether or not a state court incorrectly decided a petitioner's Fourth Amendment claim is immaterial to the "full and fair opportunity" analysis).

Accordingly, the court will overrule Perry's objection and dismiss his claim that the search warrant was issued without probable cause in violation of the Fourth Amendment as procedurally defaulted and non-cognizable.

**B.    Ground One (c):  Perry's Claim That His Sixth Amendment Right to Confront Witnesses Was Violated at the Suppression Hearing Fails Because No Confrontation Clause Issues Were Implicated**

In Ground One (c), Perry claims that his Sixth Amendment right to confront witnesses was violated at the suppression hearing because Detective Miller, who authored the probable cause affidavit, died beforehand and was therefore not available for cross-examination.  (Pet. 9 ("The Affiant made testimonial statements in the Affidavit of Probable Cause that went "unconfronted," due to the death of the affiant before petitioner's arrest in 2001." [sic]).)  The Sixth Amendment's Confrontation Clause provides that, "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him."  U.S. Const. Amend. VI.

The Magistrate Judge recommended that Perry's Confrontation Clause claim be denied because the affidavit by Detective Miller was based, in substantial part, upon the statements made to Detective Miller by Richard Sussman and Reid Evans, witnesses who testified at the suppression hearing and who were subject to cross-examination.  (R&R 14.)  The trial court analyzed Crawford v. Washington, 541 U.S. 36, 68 (2004), which held that a testimonial, out-of-court statement against an accused is barred unless the witness who made the statement is unavailable to testify and the witness was previously subjected to cross-examination by the accused in the proceeding.  2004 Trial Ct. Op. at 23.  The trial court concluded that Crawford had no application to the case because the sources and substance of the affidavit – i.e., Richard Sussman and Reid Evans – were subject to cross-examination at the suppression hearing:

> As both Sussman and Evans were both called to the stand as witnesses and thus were questioned as to the circumstances surrounding their giving of statements that incriminated the Appellant to Detective Miller, the Sixth Amendment cannot be said to have been violated.

Id. at 23.  The trial court further determined that, because the Confrontation Clause had not been offended, "the proper characterization of this issue should have been one attacking the veracity of the facts underlying the probable cause of the Search Warrant."  Id. at 23-24.  Having framed the issue in this manner, the trial court concluded that it was within its discretion when (1) it did not find credible the testimony of Evans repudiating the letter he had written that implicated Perry and (2) it found the testimony of Richard Sussman and Detective McDonald credible instead.  Id. at 24-25.  The Superior Court adopted the trial court's opinion as its own, agreed with its disposition, and affirmed on the basis of the trial court's opinion.  2005 Super. Ct. Op. at 7.  I conclude that the trial court's analysis of Perry's claim under Crawford, as adopted and affirmed by the Superior Court, was an objectively reasonable application of federal law, and that therefore habeas relief is not available.

Perry now argues, however, in his objections to the Magistrate Judge's Report and Recommendation, that the affidavit names Richard Sussman's father, Charles Sussman, "as the person who actually provided the police sketch artist the description which produced the composite sketch in 1980" but that neither Charles Sussman nor the police sketch artist testified at the suppression hearing.  (Objections 7.)  He did not raise this argument in this context in his petition and it is, therefore, untimely and procedurally defaulted.  He nevertheless now asserts that he had a right under the Confrontation Clause to confront both of these witnesses at that time.  (Id. at 8.)  He assumes, incorrectly, that he had the same rights under the Confrontation Clause at the suppression hearing that he may have had at trial.  The Supreme Court has explained, however, that "[t]he right to confrontation is basically a trial right."  Barber v. Page,

390 U.S. 719, 725 (1968). The Confrontation Clause bars "admission of testimonial statements of a witness who did not appear *at trial* unless he was unavailable to testify, and the defendant had a prior opportunity for cross-examination." Crawford, 541 U.S. at 53-54 (emphasis added). Because the right to confrontation is basically a trial right, the Supreme Court has noted that the due process interests at stake in a suppression hearing are of a lesser magnitude than those in a criminal trial itself. United States v. Raddatz, 447 U.S. 667, 679 (1980) ("[T]he process due at a suppression hearing may be less demanding and elaborate than the protections accorded the defendant at the trial itself."); United States v. Matlock, 415 U.S. 164, 174-75 (1974) (noting the inapplicability of the defendant's confrontation rights to a suppression hearing).[14]

In any event, Charles Sussman and the police sketch artist did not testify at the suppression hearing or at trial, or have any statement made by them admitted. Accordingly, no Confrontation Clause issues are implicated. Given that Confrontation Clause rights at a suppression hearing are of lesser magnitude than at trial, and given that, for example, Richard Sussman, Reid Evans, and Detective McDonald did testify at the suppression hearing and were subject to cross-examination at that time, the court concludes that the lack of any testimony by or cross-examination of Charles Sussman or the police sketch artist at the suppression hearing was not a violation of Perry's rights under the Confrontation Clause.

---

[14] "[T]he Constitution does not require 'the government to call every witness competent to testify.'" Cox v. Timoney, Nos. 00-cv-5242 and 00-cv-5243, 2001 WL 881726, at *3 (E.D.Pa. Apr. 26, 2001) (quoting United States v. Moore, 954 F.2d 379, 381 (6th Cir. 1992)). Moreover, the Sixth Amendment's Compulsory Process clause provided Perry with the right "to have compulsory process for obtaining witnesses in his favor," and the Pennsylvania Rules of Criminal Procedure allowed the court to "issue such process as may be necessary for the summoning of witnesses for the Commonwealth or the defendant," Pa. R. Crim. P. 545(A). Perry does not allege that he exercised these rights or that these rights were interfered with by the Commonwealth. Cox, 2001 WL 881726, at *3. Thus, he could have subpoenaed Charles Sussman or the police sketch artist, or both, to appear at the suppression hearing or at trial if he so chose.

In fact, Perry's claim under the Confrontation Clause is simply a Fourth Amendment probable-cause claim in disguise. By arguing that no evidence obtained through the search warrant should have been admitted at trial because neither Charles Sussman nor the sketch artist testified at the suppression hearing, Perry is, essentially, trying to re-litigate his claim that the search warrant lacked probable cause. As noted above, Perry was given a full and fair opportunity to address any such probable cause claims during the suppression hearing itself. Perry's claim is therefore barred under the well-settled Supreme Court precedent of Stone v. Powell, *supra*.

Accordingly, the court will overrule Perry's objection and deny his claim that the use of evidence obtained based on the search warrant violated his Confrontation Clause rights. The state courts made an objectively reasonable application of Crawford and the Confrontation Clause.

### C. Ground Two: Perry's Claim That the Photo Array Shown to Richard Sussman Was Unduly Suggestive Fails Because the Trial Court and Superior Court's Rejection of the Claim Was Not Contrary to Nor an Unreasonable Application of Federal Law

In Ground Two, Perry claims that the photo array from which Richard Sussman identified him in 1992 was unduly suggestive and prejudicial in violation of his Due Process and Confrontation Clause rights. (Pet. 9.) Perry's claim is based on allegations that: (1) Perry was the only suspect in the photo array who had a bandage over his eyebrow; (2) the time that had passed from the date of the crime to the date of the identification rendered the identification unreliable; and (3) Richard Sussman collaborated on the identification with his father, Charles Sussman, in violation of the Confrontation Clause. (Id.) The Magistrate Judge recommended that this claim be denied because the determination by the state courts that the identification was

not unduly suggestive was not contrary to nor an unreasonable application of Supreme Court precedent.  (R&R 17.)

The state courts found that Perry had several meaningful opportunities to confront Richard Sussman concerning the identification, including at the suppression hearings and at trial. 2004 Trial Ct. Op. 20-21, 23; 2005 Super. Ct. Op. 7 (adopting and affirming trial court opinion). Richard Sussman testified that:  (1) he, not Charles Sussman, described the suspect to the police sketch artist; (2) the report of his police interview was in error when it suggested that he, not Charles Sussman, was the one who had seen the suspect from behind; and (3) he alone identified Perry in 1992, and Charles Sussman was not present when he did so.  (9/5/02 Suppression Tr. 11-12, 15-16, 18, 19-22; 12/18/02 Suppression Tr. 5-13; 9/22/03 Trial Tr. 118-19, 140, 143, 144.) The trial court found this testimony credible.  2004 Trial Ct. Op. 24-25.  To the extent it may have contributed to the jury's verdict, the jury also accepted it.  Perry offers no evidence to support the claim that Richard and Charles Sussman collaborated on the identification.

The state courts correctly considered the reliability of the identification, including the issues raised by Perry, based on factors consistent with those set forth in Neil v. Biggers, 409 U.S. 188, 197 (1972).  The Supreme Court held in Biggers that "convictions based on eye-witness identification at trial following a pretrial identification by photograph will be set aside on that ground only if the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification."  Id. at 196-197 (quoting Simmons v. United States, 390 U.S. 377, 384 (1968)).  Examined in light of the "totality of the circumstances," the factors to be considered under the federal standard are "the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and

the confrontation." Biggers, 409 U.S. at 199-200. Similarly, under the state standard set forth in Commonwealth v. Moore, 534 Pa. 527, 540 (1993), the trial court considered the following factors:

> (1) the manner in which identification procedure was conducted, (2) the witness' prior opportunity to observe, (3) the existence of any discrepancies between the witness' description and Appellant's appearance, (4) any previous identification, (5) any prior misidentification, (6) any prior failure of the witness to identify Appellant, and (7) the lapse of time between the incident and court identification.

2004 Trial Ct. Op. 18-19. The state standard set forth in Moore is consistent with – and, indeed, explicitly references – Supreme Court precedent. Moore, 534 Pa. at 540 ("In ruling on whether the Commonwealth has met its burden, the trial court must determine whether there has been suggestiveness employed during the process of photographic identification which creates a very substantial likelihood of irreparable misidentification.") (citing Simmons, 390 U.S. 377, and Biggers, 409 U.S. 188). The Superior Court affirmed on the basis of the trial court's opinion. 2005 Super. Ct. Op. 6-7.

Accordingly, the court will overrule Perry's objection and deny his claim that the photo array from which Richard Sussman identified him in 1992 was unduly suggestive and prejudicial in violation of his Due Process and Confrontation Clause rights. The determination by the state courts that the identification was not unduly suggestive was not contrary to nor an unreasonable application of Supreme Court precedent.

**D.    Ground Four (a):  Perry's Claim That His Counsel Was Ineffective Because He Allegedly Failed to Move for Suppression of Richard Sussman's Identification of Perry Fails Because the Claim is Factually Wrong, Procedurally Defaulted, And, Regardless, Lacking Merit**

In Ground Four (a), Perry claims that his counsel was ineffective because he failed "to obtain full and proper adjudication of the Suggestive Identification through pre-trial suppression." (Pet. 9.) Perry is wrong factually because his counsel did, in fact, challenge the

admissibility of the identification in an omnibus pre-trial motion and supporting memorandum of law, a challenge which the suppression court rejected. Feb. 5, 2003 Suppression Ct. Order 1-2. As discussed above, the trial court explained in its 2004 opinion the basis for its finding that the photo array was not unduly suggestive or prejudicial. 2004 Trial Ct. Op. 20-21. The Superior Court adopted the trial court's opinion as its own, agreed with its disposition, and affirmed on the basis of the trial court's opinion. 2005 Super. Ct. Op. at 5, 7.

Furthermore, the claim is procedurally defaulted because Perry did not raise it in any state appellate court. In his direct appeal to the Superior Court, his PCRA petition, and his PCRA appeal, Perry did not claim that his counsel was ineffective by failing to move for the suppression of the identification – instead, he claimed that the court erred when it failed to suppress the identification. (Statement of Matters Complained of on Appeal, Apr. 12, 2004; PCRA Petition 4-8; 1925(b) PCRA Concise Statement ¶ 3; Perry, 959 A.2d at 935.)

Now, in his objections to the Magistrate Judge's Report and Recommendation, Perry claims ineffective assistance of counsel on the ground that Richard Sussman's testimony was contradicted by Detective Miller's affidavit of probable cause, which stated that Charles Sussman was the source of the description on which the 1980 composite sketch was based. (Objections 3.) Perry claims that he would likely have prevailed on all the pre-trial issues, including the suggestive identification issues, if his counsel had raised the issue of this contradiction at the suppression hearing. (Id. at 4.)[15] The only evidence Perry offers in support of his argument is the statement by Detective Miller in the affidavit of probable cause that the photograph of Perry used

---

[15] Referring to the "investigative report by the Delaware Police Department about conversations with Mr. Sussman," Perry's counsel cross-examined Richard Sussman at the suppression hearing regarding whether he or his father was the source of the description of the suspect given to the police, but did not explicitly refer to the composite sketch in this context. (12/18/02 Suppression Tr. 4:12-10:15.)

in the array shown to Richard Sussman was "similar to the composite drawing done by Philadelphia Police based on description given by Charles Sussman in 1980." (Aff. Probable Cause 6.) Based on this statement, Perry claims that the testimony of Richard Sussman that the source of the description was not Charles Sussman but Richard Sussman himself was false and that had the suppression court been "made aware of" the statement in the affidavit, suppression would have been granted. (Objections 4.)

Perry is again wrong on the facts. Richard Sussman testified at the suppression hearing that he was the source of the description that was the basis for the composite sketch. (9/5/02 Suppression Tr. 15:2-4, 15:12-16:5, 16:3-5, 18:7-11; 12/18/02 Suppression Tr. 12:9-11, 13:13-18.) Richard Sussman also explained that, as a result of the joint interview by the police of him along with his father, there may have been confusion concerning what he and his father each witnessed. (12/18/02 Suppression Tr. 6:20-24, 7:21-22, 9:16-20, 10:1-8, 11:14-15, 11:18-23.) Thus, the discrepancy was explained. The suppression court considered the affidavit and the issue of the discrepancy between what Richard Sussman and his father each witnessed, and it found that Richard Sussman was credible and that the search warrant was supported by probable cause, a judgment which the trial court affirmed in its 2004 opinion. Feb. 5, 2003 Suppression Ct. Order 1-2; 2004 Trial Ct. Op. 22-25. On direct appeal, the Superior Court affirmed and adopted the trial court opinion, including as to the issue of "[w]hether the trial court erred when it failed to suppress the identification of [Perry] by Richard Sussman since the identification was tainted due to procedures used by police in dealing with Mr. Sussman and his father[.]" 2005 Super. Ct. Op. 6-8. Perry has not proffered any evidence that Charles Sussman would have testified differently. Perry has not established that any "inaction and omission" by his counsel "fell below an objective standard of reasonableness under prevailing professional norms." Buehl, 166 F.3d at 169.

Furthermore, regardless of the fact that Perry's counsel addressed at the suppression hearing the issue of the discrepancy regarding what Richard Sussman and his father each witnessed, Perry has not established that he was prejudiced by his counsel's alleged "inaction or omission." Not only had Richard Sussman already provided an explanation for any confusion regarding what he and his father witnessed, which the trial court found credible, but other independent, cumulative evidence – including the statement of Reid Evans as to Perry's admissions and the initial DNA and hair analysis – existed in the affidavit of probable cause to support the admission of the evidence obtained through the search warrant.

Accordingly, the court will overrule Perry's objection and deny his claim that his counsel was ineffective because he failed to move for the suppression of the 1992 identification by Richard Sussman or to point out the discrepancy between the Miller affidavit and Richard Sussman's testimony.

### E. Ground Four (b): Perry's Claim That His Counsel Was Ineffective by Failing to Object at the Suppression Hearing to Prosecutorial Misconduct When the Prosecutor Elicited Allegedly False Testimony That Richard Sussman, Not Charles Sussman, Provided the Description to the Police Sketch Artist Fails Because Perry Has Not Made a Showing That the Testimony Was False or That the Prosecutor Knew It Was False

In Ground Four (b), Perry claims that his counsel was ineffective for failing at the suppression hearing to object to "prosecutorial misconduct" by the prosecutor eliciting allegedly false testimony from Richard Sussman that he, not his father, was the source of the description on which the composite sketch was based. (Pet. 9-10.) The Magistrate Judge recommended that Perry's claim be dismissed because Perry had not proffered any evidence that Richard Sussman's testimony was false. (R&R 10.)

Nevertheless, without citing any additional evidence to support his claim, Perry continues to argue that his counsel should have objected to Richard Sussman's testimony at the suppression

hearing regarding the composite sketch. (Objections 6.) Such an objection would have had no merit and, therefore, cannot be the basis for an ineffective assistance of counsel claim. Other than the statement in Detective Miller's affidavit of probable cause, there is nothing to suggest that Charles Sussman, not Richard Sussman, was the source of the description that was the basis for the composite sketch. At the suppression hearing, Richard Sussman explained that he provided the description to the police sketch artist, in the presence of his father. (9/5/02 Suppression Tr. 15:2-4, 15:12-16:5, 16:3-5, 18:7-11; 12/18/02 Suppression Tr. 6:20-24, 7:21-22, 9:16-20, 10:1-8, 11:14-15, 11:18-23, 12:9-11, 13:13-18.) The suppression court heard Richard Sussman testify at the suppression hearing concerning the issue of the discrepancy between what he and his father each witnessed, the suppression court found him credible, and the trial court and the Superior Court affirmed the determination. Feb. 5, 2003 Suppression Ct. Order 1-2; 2004 Trial Ct. Op. 22-25; 2005 Super. Ct. Op. 6-8. Perry has submitted no evidence to undermine the court's determination and certainly no factual basis for Perry's claim that the prosecutor knew Richard Sussman's testimony was false.[16] The PCRA court found that:

> There was no evidence presented in the PCRA petition nor was there any evidence presented at or prior to trial that [Richard] Sussman's testimony regarding [Perry] was false or that the prosecuting attorney knew or should have known he was presenting false testimony to the jury. . . . The allegations of . . . prosecutorial misconduct are bald allegations and are without merit[.]

2007 PCRA Court Op. at 5; see also 2007 PCRA Court Order at ¶¶ 22, 26 (stating same). Furthermore, the Superior Court reasonably determined that Perry's trial counsel properly addressed whether Richard Sussman or his father provided the information to the sketch artist.

---

[16] Perry also argues, as to this claim, that the suppression hearing violated his Sixth Amendment right to confront witnesses. As discussed in Section III.B., *supra*, the Confrontation Clause was not implicated at the suppression hearing.

*Perry*, 959 A.2d at 935-936.  These determinations by the state courts were not contrary to nor an unreasonable application of federal law nor an unreasonable determination of the facts.

Accordingly, the court will overrule Perry's objection and deny his claim that his counsel was ineffective for failing to object to the prosecutorial misconduct eliciting allegedly false testimony from Richard Sussman.

**F.   Ground Four (c):  Perry's Claim That His Counsel Was Ineffective by Failing to Call the Police Sketch Artist as a Witness or to Subpoena the Police Sketch Artist's Files Fails Because It Is Lacking in Merit and Procedurally Defaulted**

In Ground Four (c), Perry claims that his counsel was ineffective because he "failed to call and/or subpoena the files of the Police Sketch Artist as a witness on behalf of Petitioners defense. [sic]"  (Pet. 10.)

The Superior Court, in ruling on Perry's PCRA petition, concluded that although Perry's counsel should have called the police sketch artist at trial, Perry could not demonstrate that he suffered prejudice at trial because the DNA evidence placed Perry in the car fleeing the scene of the crime, Perry's trial counsel cross-examined Richard Sussman at trial about the discrepancies in his identification of Perry, and Perry's counsel argued to the jury that the identification was unreliable.  *Perry*, 959 A.2d at 937.  The Superior Court concluded that Perry had not established that he was prejudiced by his trial counsel's ineffectiveness as to this claim.  Id.  "In the face of overwhelming evidence against [Perry], we cannot conclude that he was sufficiently prejudiced by trial counsel's failure to subpoena the sketch artist."  Id.  To the extent that Perry's claim in the instant motion raises issues concerning his counsel's performance at trial, the Superior Court's conclusion that Perry was not prejudiced at trial by his counsel's failure to subpoena the police sketch artist's files or call him as a witness was not contrary to nor an unreasonable application of federal law or an unreasonable determination of the facts.

In the face of the Superior Court's conclusion, however, Perry now limits his claim to the argument that the police sketch artist's testimony *at the suppression hearing* would have "enhanced" his "fundamental rights to a fair trial" and would have "presented a full defense":

> Counsel's failure to present the Police Sketch Artist as a witness during the September 5, 2002, Suppression Hearing to establish a material fact in this case, denied Petitioner's rights under the sixth and fourteenth amendments to the United States Constitution to the extreme of Petitioner being illegally convicted of an alleged murder based on false evidence.

(Objections 9-10.)

Perry did not raise in post-sentence motions, on direct appeal, or in his PCRA petition the issue of his counsel's failure to present the police sketch artist as a witness at the suppression hearing. The first appearance of Perry's claim that his counsel was ineffective by failing to call the police sketch artist as a witness is in the "no merit" letter in which Perry's PCRA counsel states that Perry's claims include that Perry's trial counsel "rendered ineffective assistance [by] failing to call John Collins [the police sketch artist] as a defense witness *at trial*." ("No Merit" Letter at 4 (emphasis added).) The PCRA court's order denying Perry's PCRA claims, and its opinion affirming that order, similarly focused only on the evidence presented *at trial*. 2007 PCRA Court Order at ¶¶ 22, 38, 41, 43, 45; 2007 PCRA Court Op. at 8-9. It was not until Perry appealed his PCRA claim to the Superior Court that Perry asserted a claim that "the Suppression Court erred in accepting the testimony of Richard Sussman without proof that Richard Sussman provided the description to the police sketch artist[.]" Perry, 959 A.2d at 935 (see also 1925(b) PCRA Concise Statement ¶ 3 ("the suppression court" erred in "accepting the testimony of Richard Sussman as the witness who is identified as Charles Sussman in the sworn affidavit of probable cause, and failed to confirm identity"). Nevertheless, Perry did not claim in his PCRA appeal that his counsel at the suppression hearing was ineffective for failing to subpoena the police sketch artist or the police sketch artist's files, only that his "*trial* counsel provided

ineffective assistance [by] failing to call the police sketch artist as a witness[.]" <u>Perry</u>, 959 A.2d

at 935 (emphasis added) (<u>see also</u> 1925(b) PCRA Concise Statement ¶ 1 ("trial and appellate

counsels" were ineffective on such grounds, "infecting the entire trial")).  Accordingly, the

Superior Court's opinion considered only whether Perry's *trial* counsel should have subpoenaed

the police sketch artist or his files *at trial*, not whether Perry's counsel should have done so at the

suppression hearing.  <u>Perry</u>, 959 A.2d at 937.  Because Perry never raised in any state court the

issue of ineffectiveness of counsel *at the suppression hearing* for failure to call the police sketch

artist or subpoena the police sketch artist's files, Perry's claim on this ground is procedurally

defaulted.

Even assuming that this claim is not procedurally defaulted, however, and that Perry's

counsel provided substandard representation at the suppression hearing, Perry has not made a

showing that he suffered any prejudice.  Richard Sussman provided an explanation at the

suppression hearing for any confusion regarding what he and his father witnessed.  According to

Richard Sussman, he and his father were interviewed jointly and the police report of the

interview did not distinguish clearly between the two.  Perry is merely speculating when he

suggests that the testimony or files of the police sketch artist would have undermined Richard

Sussman's credibility.  Perry has not made any showing of what the testimony of the police

sketch artist would have been or how it would have been both material and favorable to him.

<u>United States v. Gray</u>, 878 F.2d 702, 712 (3d Cir. 1989) (petitioner claiming ineffective

assistance of counsel for failure to investigate potential witnesses must make a showing of how

the testimony of a witness would have been both material and favorable).  Furthermore, other

independent, cumulative evidence – including the statement of Reid Evans as to Perry's

admissions and the initial DNA and hair analysis – existed to deny suppression and support the

admission of the evidence obtained through the search warrant.

Accordingly, the court will overrule Perry's objection and deny his claim that his counsel was ineffective because he failed to call the police sketch artist as a witness or to subpoena the police sketch artist's files.

### G.    The Court Will Not Issue a Certificate of Appealability

In addition, the court will not issue a certificate of appealability (a "COA") under 28 U.S.C. § 2253(c):

> Where a district court has rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c) is straightforward:  The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong. . . . When the district court denies a habeas petition on procedural grounds without reaching the prisoner's underlying constitutional claim, a COA should issue when the prisoner shows, at least, that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling.

Slack v. McDaniel, 529 U.S. 473, 483-484 (2000) (petitioner must make a "substantial showing of the denial of a constitutional right" by demonstrating that "reasonable jurists" could debate whether the petition should have been resolved differently or "that the issues presented were adequate to deserve encouragement to proceed further") (internal quotation marks and citation omitted).  The court concluded that three of Perry's claims are procedurally defaulted:  Ground One(a), the probable-cause claim; Ground Four (a), the ineffectiveness of counsel claim based on the alleged failure to move to suppress Richard Sussman's identification of Perry; and Ground Four (c), the ineffectiveness of counsel claim based on the failure at the suppression hearing to subpoena the police sketch artist or his files.  As to these three claims, jurists of reason would not debate that:  (1) the petition does not state a valid claim of the denial of a constitutional right; and (2) the court's procedural ruling was correct.  Similarly, as to Perry's remaining claims, the merits would not be considered debatable among reasonable jurists.  As to these claims, there has

been no substantial showing of the denial of a constitutional right. Therefore, a COA shall not issue in this case.

## IV.     Conclusion

After conducting a *de novo* review of the Magistrate Judge's Report and Recommendation, and upon consideration of Perry's objections, the court will overrule his objections, adopt the report in substantial part, and approve the recommendation. Perry's claims are factually wrong, procedurally defaulted, or lack merit based on long-standing Supreme Court precedent. In addition, the court will not issue a certificate of appealability. An appropriate order follows.